IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

GERALD BURGE and DARRELL ROSS                                                            PLAINTIFFS

VERSUS                                                           CIVIL ACTION NO. 1:03cv178WJG-JMR

SUSAN SMITH WILLIAMS                                                                      DEFENDANT

BENCH OPINION

    This cause came on for trial before the Court without a jury on February 22, 2005. The evidence being closed and both sides having finally rested, the Court, after due consideration of the evidence of record, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)[1].

    Gerald Burge and Darrell Ross, plaintiffs in this case, filed suit against Susan Smith Williams on December 20, 2002, in the Chancery Court of Pearl River County, Mississippi, seeking specific performance of an alleged agreement dated February 2, 1994, for an undivided one-half interest in Allied Heirlooms, Inc. [Allied]. (Ct. R., Doc. 1, pp. 1-2.) That case was removed to this Court on the basis of diversity of jurisdiction. (Ct. R., Doc. 1.)

    The prelude to the alleged agreement surrounds the personal and business affairs of Williams' father, Jack Diamond. Diamond suffered a debilitating stroke during 1993 to the point that he could no longer care for himself or his business, Allied. (Exh. D-4, p. 6.) Williams gave up her job as a bookkeeper at Adams and Reese law firm in New Orleans, Louisiana to care for her father on August 9, 1993. (*Id.*, pp. 2-3.) Williams is Diamond's sole heir and received all his

---

[1]*North Am. Capacity Ins. Co. v. Brister's Thunder Karts, Inc*., 287 F.3d 412, 414 (5th Cir. 2002).

property through his will at the time of his death on November 19, 2001. (*Id*., p. 2.) Clara Galle, a former girlfriend of Diamond, had worked with him in establishing Allied's business. (Exh. D-4, p. 1.) Galle had a contractual interest in Allied pursuant to contracts entered between Diamond and Galle in 1986. (*Id*.) Galle and Williams were appointed as Diamond's temporary co-conservators with authority to handle all his affairs and the continued operation of Allied on August 9, 1993. (Exh. P-2.) On August 27, 1993, Letters of Conservatorship were entered appointing Galle and Williams as conservators of Diamond's person and estate. (Exh. D-3.)

Prior to Diamond's death, Williams took care of her father's medical needs and Galle controlled the business. Galle hired Burge to provide services to the business and he billed the conservatorship for construction and security services. (Exh. D-11, pp. 11-12, 15, 48.) Based on Burge's recommendation to Galle, Sam Cooper served as attorney for the conservatorship. (Ct. Exh. 1; Exh. D-11, p. 76.)

On December 21, 1993, the co-conservators filed a petition which included, *inter alia*, a request that Galle and Williams be allowed to vote shares of stock. (Exh. D-4.) Cooper prepared the petition which was approved by the Chancery Court of Pearl River County on January 5, 1994. (Exh. D-5.) The co-conservators were given the authority to transfer Allied shares as follows: Diamond - 1/3; Galle - 1/3 and Williams - 1/3. (*Id*.)

According to Williams' trial testimony, Galle was depleting funds from Allied and would not agree to take less money for acting as co-conservator. (Williams' Trial Test.) Ultimately, Galle decided to leave. (*Id*.) A petition to allow Galle to resign as conservator was prepared and presented to the court pursuant to the agreement reached between Galle and Williams on

February 1, 1994, releasing Galle from liability for her actions as co-conservator. (Exhs. D-6, D-7.) Within that agreement, Galle relinquished any claim to Diamond's assets or personal property and renounced any gift or devisee in Diamond's will to her. (Exh. P-4, p. 1.)

Williams agreed to hold Galle harmless for any liability from past actions as conservator and from any liability of anyone that might have a right of action against Galle because of acts taken as Diamond's co-conservator. (*Id*.) Galle and Williams agreed to cancel any verbal or written agreement which may be interpreted as a partnership agreement between them and Galle relinquished any right to any interest in any corporation or stock in any corporation and assigned those rights to Williams. (*Id*., p. 2.) The court accepted Galle's resignation and appointed Williams as sole conservator of Diamond on February 2, 1994. (Exh. D-8.)

Burge approached Williams with an agreement that same day, which Williams executed under duress according to her testimony based on her belief that the chancery court would have to approve the agreement. (Williams' Trial Test.) The agreement provided that in consideration by Burge and Ross to assist in Allied's daily operations and the conservatorship of Diamond, Williams agreed to enter into a partnership with Burge and Ross in which Burge and Ross would receive an undivided one-half interest in Williams' interest in Allied in exchange for their services in the daily operation of Allied's business. (Exh. P-1, p. 1.) Following the execution of this document, Burge and Ross were placed on a retainer type arrangement, with both individuals either working in Allied's daily operations or providing security services. Jack Parsons, acting as former attorney for Diamond, entered an appearance and moved to have Williams removed as conservator and for the appointment of a *guardian ad litem* for Diamond on March 21, 1994. (Exh. D-10.) Parsons asserted that the order entered January 5, 1994, purporting to divide

Allied's stock without payment for the shares was an attempt to avoid federal and state law and in violation of the fiduciary relationship. (*Id*., p. 2.) The petition contended that large amounts of cash and personal property were depleted from Diamond without Court approval. (*Id*.) The petition further sought to dissolve the January 5, 1994, order distributing the shares of Allied. (*Id*., p. 4.)

In a hearing on the motion to remove Williams as Diamond's conservator, testimony was presented to show that an inventory was not filed as required by Mississippi law. (Exh. D-12, April 11, 1994, motion hearing, p. 4.) In addition, when Williams and Galle were appointed as co-conservators, the court specified that any expenditure must be authorized before the expenses are paid out of the conservator funds. (*Id*., p. 5.) There was no approval of expenditures allegedly made for Diamond's care, or for salaries for the conservators. (*Id*., pp. 5-7.)

Burge was questioned regarding payments made to him for worked performed for Allied. (*Id*., p. 15.) Burge testified that Galle hired him to perform the work, and as a result, he did not obtain authority from a court to be paid for the work he performed. (*Id*.) Burge stated that he had spent time in prison on a murder charge. (*Id*., p. 16.) He became acquainted with Ross while both were serving time in the penitentiary and recommended that Ross be hired to Galle and Williams. (*Id*., p. 18.)

Burge admitted that he was initially hired by Galle to investigate Diamond and Allied in an effort by Galle to take over the business. (*Id*., pp. 21, 24.) He stated that he introduced Galle to Cooper to allow Galle to establish the conservatorship, which he characterized as an application to "take the place over." (*Id*., p. 22.) After the conservatorship was in place, Burge stated that Galle was in charge of Allied. (*Id*., p. 23.) On September 10, 1993, all of Allied's funds were

frozen by the chancery court, which included all bank accounts of every type. (*Id*., pp. 77-8.)

The chancery court, after the final hearing of testimony on the petition, found "gross mismanagement" of the estate citing transfer of assets of the estate to the estate's attorney; payment of attorney's fees; payments to Burge, Ross and Louisiana Computers; checks written to cash; check cashing; payment of conservators' fees and expenses, including bonuses; placing individuals in positions of trust and with access to books and records who had questionable backgrounds; and other actions all taken without approval of the court. (Exhs. D-11 & 12, pp. 1-2.) Any attempt to transfer Diamond's stock was declared void. (Exh. D-12, p. 3.)

Williams knew to seek permission from court in January 1994 to split the stock into thirds. (Exh. D-5.) According to trial testimony, Williams felt threatened by Burge and was under duress because she knew that Galle was planning to leave the business. (Williams' Trial Test.) She testified that she knew that any agreement entered between herself, Burge and Ross had to be approved by the court. (*Id*.) She denied having prepared the agreement providing the transfer of one-half of her interest in Allied to Burge and Ross. (*Id*.) Williams testified that she did not tell the court about the alleged agreement with Burge and Ross concerning the stock split. (*Id*.) She further testified that neither Burge nor Ross mentioned her inheritance at any time. (*Id*.) The Court finds incredible that Williams would seek approval of the court to split stock between herself, Galle and Diamond, and to approve the resignation of Galle on February 2, 1994, but on the same day fail to seek approval of the court to convey to Burge and Ross one-half of Diamond's stock, for no more consideration than the continued employment of Burge and Ross in the business operations, for which both individuals received a salary. (Exhs. D-8 & 9.)

Ross testified that he was paid $450 a week for running Allied's business and keeping its

computers operational. (Ross' Trial Test.) He claimed that Williams told him that if he remained working at the business after Galle left on February 1, 1994, he would receive one-fourth of the business per their agreement. (*Id*.) He testified that the type face on the document memorializing the alleged agreement between him, Burge and Williams was different on each page. (*Id*.) He further stated that he did not know who had prepared the document, other than being sure he had not prepared the document. (*Id*.)

Burge testified that Williams presented the proposed stock agreement between himself, Ross and Burge that she had allegedly prepared for their signature, claiming that she was afraid to run the business by herself. (Burge's Trial Test.) According to Burge, Williams made corrections to the document on the date it was notarized, thereby accounting for the differences in the typeface in the document. (*Id*.) He stated that he was summoned to testify at the hearing regarding the motion to remove Williams as conservator. (*Id*.) He claims that Williams asked him not to say anything in court about the stock agreement because she and Galle were disagreeing over some boxes. (*Id*.) When questioned, Burge admitted that he was convicted in 1999 of false statements in connection with health benefits. (*Id*.; Exh. D-13.) Burge stated that after Diamond died he made a claim against the estate for his share of the stock. (Burge's Trial Test.)

Burge testified that in exchange for the agreement with Williams for one-half of Diamond's business, Burge agreed to "keep the place up." (*Id*.) He denied preparing the agreement with Williams, stating that although he had a computer at his house, he did not know how to operate it and instead paid someone to do computer work at his house. (*Id*.) Burge testified that he filed a claim against Diamond's estate however that claim was dismissed. (*Id*.)

Ultimately, the chancery court found that Williams "grossly mismanaged" the

conservatorship by distributing payments to individuals, including Burge and Ross without approval of the court; payment of "exorbitant" conservator's fees and expenses including bonuses to conservators; placing people in positions of trust and leadership whose backgrounds are "questionable at best"; and "other actions too numerous to enumerate." (Exhs. D-11, pp. 173-75; D-12, p. 2.) The court found that no assets of Diamond's, his estate, or of any corporation with which he is associated should be transferred until further court order. (*Id.*, pp. 2-3.) The order appointing Williams as conservator was set aside, and the court vacated as null and void *nunc pro tunc* the order entered on January 5, 1994, which purported to distribute shares of Allied's stock. (*Id.*, p. 3.) Burge, Ross and Williams were enjoined from interfering with or entering on to any of Diamond's property. (*Id.*) Williams was removed as conservator because of her failure to perform her statutory duties. (Exh. D-12.)

According to his trial testimony, Ross began working at Allied on the computers in October or November 1993. (Ross' Trial Test.) Ross was paid by Burge, not Allied, based on the number of hours he worked prior to the February 1994 agreement with Williams. (*Id.*) Then he worked on a salary basis for Allied until he was removed by Carle Cooper[2], the person appointed as Diamond's conservator when Williams was removed in April 1994. (*Id.*) Ross testified that he met Burge in Angola, Louisiana state prison when Ross was serving his sentence for drug distribution. (*Id.*) Ross testified that he had no input on the agreement to distribute Allied between himself, Burge and Williams. (*Id.*) He stated that he thought Cooper prepared the document, although he admitted it was possible that Burge had prepared it. (*Id.*)

Burge testified that he recommended that Galle use Cooper to set up the conservatorship for

---

[2]Exh. D-12, p. 2.

7

Diamond. (Burge's Trial Test.) Cooper had assisted Burge in the past with legal problems and helped Burge set up his corporation in February 2003. (*Id*., Exh. D-16.) Burge claims he did not prepare the agreement to transfer Williams' interest in Diamond's property to him and Ross, but surmised that it was possible Ross prepared the agreement. (Burge's Trial Test.) Burge claims that Williams did not trust the court system and asserted that Williams suggested the transfer of the business to keep Burge working at Allied. (*Id*.) Burge testified that he had a criminal record for Medicaid fraud and served time in Angola for murder, but that he was exonerated of the murder charge. (*Id*.)

Cooper testified that he had been friends with Burge for about 30 years, and agreed that he had done legal work for him in the past. (Cooper's Trial Test.) Cooper stated that he did not prepare the February 1994 agreement to transfer Williams' share of Diamond's property to Burge and Ross. (*Id*.) Cooper said that neither Williams nor Burge spoke to him about transferring part of Allied from Williams to Burge and Ross. (*Id*.) Cooper advised Williams to set up the corporation as a one-third split between Galle, Diamond and Williams to avoid estate taxes. (*Id*.) Cooper further stated that after Williams was removed as conservator in April 1994 he had no other contact with her. (*Id*.) He stated he represented Williams as her attorney until that point. (*Id*.)

## Legal Analysis

"Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character." *Hendricks v. James*, 421 So.2d 1031,

1041 (Miss. 1982).  Fiduciaries are held the same standard of care used to review the actions of an executor of an estate.  *Harper v. Harper*, 491 So.2d 189, 194 (Miss. 1986).  Their duties are as follows:  (1) to reduce to possession the personal assets of the [ward]; (2) to pay the [ward's] debts; (3) to pay legacies; and (4) to distribute the surplus to entitled parties.  *Harper*, 491 So.2d at 194, quoting *Yeates v. Box*, 198 Miss. 602; 22 So.2d 411 (Miss. 1945).

Several Mississippi statutes are applicable in this case.  To begin, Mississippi Code Annotated Section 93-13-251 (Rev. 2004) provides as follows:

> If a person by reason of advanced age, physical incapacity or mental weakness is incapable of managing his own estate, the chancery court of the county wherein such person resides may, upon the petition of such person or of one or more of his friends or relatives, appoint a conservator to have charge and management of the property of such person, and if the court deems it advisable, also to have charge and custody of the person subject to the direction of the appointing court.

MISS. CODE ANN. § 93-13-251.

In other words, once a conservator is appointed, the conservator is subject to the direction of the appointing court.  In addition, section 93-13-33 states as follows:

> Every guardian shall, within three months after [her] appointment, return to the court, under oath, a true and perfect inventory of the estate, real and personal, and of all money or other things which [she] may have received as the property of [her] ward; and [she] shall return additional inventories of whatever [she] may subsequently receive. And [she] shall annually return an inventory, under oath, of the increase of the estate, if there be any. A guardian who shall fail to return inventories may be removed and [her] bond put in suit, unless [she] can show cause for the default.

MISS. CODE ANN. § 93-13-33.

> It shall be the duty of the guardian of wards as defined by Section 1-3- 58, Mississippi Code of 1972, to improve the estate committed to [her] charge, and to apply so much of the income, profit or body thereof as may be necessary for the comfortable maintenance and support of the ward and of his family, if he have any, after obtaining an order of the court fixing the amount. And such guardian may be authorized by the court or chancellor to purchase on behalf of and in the name of the ward with any funds of such ward's estate sufficient and appropriate property for a

>home for such ward or his family on five (5) days' notice to a member of said family, or the necessary funds may be borrowed and the property purchased given as security. The guardian is empowered to collect and sue for and recover all debts due [her] said ward, and shall make payment of his debts out of the personal estate as executors and administrators discharge debts out of the estate of decedents, but the exempt property of the ward shall not be liable for debts, and no debts against such estate shall be payable by such guardian unless first probated and registered, as required of claims against the estate of decedent.

MISS. CODE ANN. § 93-13-38.

The guardian (or conservator) has no power to bind the estate of her ward without the sanction of the chancery court or the chancellor, and when a conservator does not act in the best interest of her ward or does not properly exercise her duties, a court may nullify action taken on behalf of the ward. *See In re Mathews,* 633 So.2d 1038, 1039-40 (Miss. 1994) (citing *Welch v. Childers,* 195 Miss. 415, 420, 15 So.2d 690, 691 (1943)); *In re Conservatorship of Bardwell*, 849 So.2d 1240, 1248-50 (Miss. 2003). Previously unauthorized but reasonable and proper expenditures from income for the ward may be ratified and approved by the court after they are made, either by special order or on the annual or final account. *Neville v. Kelso's Guardianship,* 247 So.2d 828, 834-35 (Miss. 1971)). The court may disallow expenditures should the court find that the expense was not in supporting, maintaining or educating the ward Neville, 247 So.2d at 834-5.

A conservator stands in the position of a trustee and is charged with the fiduciary duty of loyalty. *Bryan v. Holzer,* 589 So.2d 648, 657 (Miss. 1991). In addition, a person in a fiduciary role is under a duty to reveal the facts regarding the maintenance of the conservatorship. *See Van Zandt v. Van Zandt*, 227 Miss. 528, 86 So.2d 466, 470 (1956). Failure to disclose relevant information, especially to the court which oversees the actions of the conservator constitutes fraud. *Van Zandt*, 86 So.2d at 470.

During Williams' service as conservator, she never obtained prior court approval for disbursements made from her father's conservatorship. The chancery court found substantial evidence to support the finding that Williams violated her fiduciary duty to her father. Although a chancery court has the power to ratify and approve expenditures from the ward's estate, this did not happen here. *USF&G v. Conservatorship of Melson*, 809 So.2d 647, 657-8 (Miss. 2002). In this case the chancery court found that the expenses outlaid by Williams were not reasonable or necessary. (Exh. D-12, pp. 1-2; Hearing Trans., April 11, 1994, pp. 5-13; and D-11, pp. 173-175.) Williams was removed as conservator on April 27, 1994. (Exh. D-12.) The chancery court determined that none of Diamond's assets or the assets of his estate or any corporation with which he was associated would be transferred until the court issued an order to that effect. (*Id.*, pp. 2-3.) The court further found that neither Williams nor Galle should transfer any stock in any corporation affiliated with Diamond. (*Id.*, p. 3.) Finally, as previously stated, the attempt to divide the stock between Diamond, Galle and Williams in January 1994 was voided by the court, *nunc pro tunc*. (*Id.*)

Based on these findings, this Court concludes that the alleged agreement between Williams, Burge and Ross was rendered void by the chancellor in 1994. The order specifically prohibited Williams' from the transfer of any stock of any corporation affiliated with Diamond. (Exh. D-12, p. 3.) That court was unaware of the alleged agreement between the parties to this suit, because none of them had sought to have the proposed agreement ratified by the chancery court, even though Williams admitted that she knew the chancery court should have approved the agreement. In fact, the chancery court set aside and held null the attempt to distribute the stock between Diamond, Galle and Williams. (Exh. D-12, p. 3.)

The fact that Burge and Ross waited until December 20, 2002, to petition the chancery court to enforce the alleged agreement between the parties shows a further attempt to circumvent the legal process in these matters. (Exh. D-1.) Burge was present and testified at the hearing to remove Williams as conservator held on April 27, 1994. (Exh. D-11, pp. 11-85.) When questioned during that hearing regarding stock in Allied, he stated that he was not aware of any stock, and had not been promised ownership in the stock by anyone other that Galle. (*Id.*, pp. 71-2.) The Court finds that had there been a valid contract between Burge and Williams for stock in Diamond's company, he could have sought the chancery court's protection of the agreement when questioned about the stock. Instead he denied knowledge of any stock, when incredibly the alleged agreement to split the stock between him, Ross and Williams was signed two months before the hearing.

Based on the findings of the chancellor, this Court finds that the alleged agreement between the parties to this lawsuit purporting to divide stock in a corporation affiliated with Diamond would also have been nullified by the chancery court, had that court been aware of the alleged agreement, just as the January 1994, agreement was nullified. Accordingly, the Court finds that the complaint for specific performance of an undivided one-half interest in Allied should be denied. The Court further finds that the parties should bear their respective costs associated with this suit.

## Conclusion

For the reasons discussed herein, the Court finds that the accepted facts and law support the conclusion that the contract between the parties was void and that neither party should benefit from the attempt to defraud the chancery court and the ward, Diamond. The Court further finds

that the request for specific performance should be denied.  Finally, the Court finds that this suit is dismissed, with prejudice, with each party to pay their respective costs associated with this lawsuit.  A separate Final Judgment in conformity with and incorporating by reference the foregoing Bench Opinion shall issue this date.

THIS the 29th day of November, 2005.

   /s/     *Walter J. Gex III*

UNITED STATES SENIOR DISTRICT JUDGE